UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MAINE

_____

| | |
|---|---|
| CEDARCREST, INC., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )  Docket No. _____ |
| | ) |
| REGIONAL SCHOOL UNIT 67, | ) |
| | ) |
|     Defendant | ) |
| | ) |

_____

## COMPLAINT
### (JURY TRIAL DEMANDED)

Plaintiff Cedarcrest, Inc. ("Cedarcrest") brings this Complaint seeking payment for educational services it provided to a minor, "NT," whose district of residence is Regional School Unit 67 ("RSU 67). Cedarcrest alleges as follows:

### The Parties

1. Cedarcrest is a New Hampshire nonprofit corporation with a principal place of business at 91 Maple Avenue, Keene, NH 03431.

2. RSU 67 is a Regional School Unit organized under 20-A M.R.S. Chapter 103-A. Its principal place of business is 25 Airport Road, Lincoln, Maine, 04457, with a mailing address of P.O. Box 69, Lincoln, Main 04457.

### Venue & Jurisdiction

3. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(a) because of diversity of citizenship of the parties and the amount in controversy exceeds $75,000.

4.      Venue is appropriate under 28 U.S.C. § 1391(b) because RSU 67's principal place of business is in this judicial district, a substantial part of the events and omissions giving rise to the claim occurred here, and RSU 67 is subject to this Court's personal jurisdiction.

### NT's Education and RSU 67's Responsibility

5.      Cedarcrest is a specialized pediatric medical facility and school providing comprehensive services to children with complex medical and developmental needs. It is the only center of pediatric post-acute care providers in New Hampshire and one of the few in New England. It admits residents and students from many states, including Maine.

6.      NT is an eight-year-old boy who was born extremely premature with complex medical challenges and severe developmental disabilities. Among other things, NT has seizure disorder, conductive hearing loss, vision impairment, chronic lung disease, hemiplegia (paralysis on one-half of the body), post-hemorrhagic hydrocephalus, and various genetic disorders. NT is non-verbal and uses a wheelchair for mobility when necessary. He utilizes a gastrotomy tube for feeding and hydration. He requires one-on-one supervision 24 hours per day.

7.      On July 15, 2019, when he was two, NT was admitted to Cedarcrest directly from Boston Children's Hospital. His medical care and residential expenses have always been paid for by the State of Maine through an agreement between Cedarcrest and MaineCare.

8.     At the time of his admission to Cedarcrest, NT's mother lived in Lincoln. Under Maine law, Maine Child Development Services bore the responsibility for educating NT during his preschool years, whereas RSU 67 bears the responsibility for educating the children of residents of Lincoln when they attain school-age 5. Because of NT's complex medical conditions and her unstable housing situation, NT's mother was not able to care for NT at home and there was no suitable medical facility close to NT's mother in Maine.

9.     Because NT has qualifying disabilities he is entitled to receive a Free Appropriate Public Education ("FAPE") under the federal Individuals with Disabilities Education Act ("IDEA"), and under parallel Maine law, s*ee* 20-A M.R.S. §§ 7006, 7202(5). The IDEA and Maine law require eligible children with disabilities to receive "special education" services, defined as specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings.

10.     Child Development Services paid Cedarcrest to provide NT with a FAPE from age three to five.

11.     Payments for NT's education from Child Development Services to Cedarcrest ceased as of August 25, 2022. Child Development Services then transferred NT's educational records to RSU 67.

12.     NT's mother registered NT as an RSU 67 student on February 2, 2023.

13.     As part of its obligations under federal and state law, RSU 67 formulated an Individualized Educational Program ("IEP") for NT, in consultation with Cedarcrest.

14.     Although legal responsibility for providing a FAPE had shifted and NT was enrolled in RSU 67 as a student for which it had educational responsibility, RSU 67 declined to pay for NT's educational services at Cedarcrest. While RSU 67 claimed that NT could be cared for at home with his mother and therefore could transition out of Cedarcrest and be educated at a school within RSU 67, it was neither medically appropriate or safe for NT to be discharged to his mother's care. She had not seen NT since November 2022. She did not have stable housing and would not participate in the required training necessary to attend to NT's complex needs. As a result of her lack of participation, both RSU 67 and Cedarcrest contacted the Maine Department of Health and Human Services to report that NT's mother had seemingly abandoned him.

15.     For purposes of educational participation and advocacy and due to his mother's lack of involvement in his life, the Maine Department of Education appointed educational surrogate parents for NT, who served in that role until approximately November 2025.

16.     After Child Development Services ceased paying NT's educational expenses, RSU 67 refused to pay for NT's educational services at Cedarcrest, despite participating in NT's regular IEP Team meetings as mandated by the IDEA and Maine law. NT's IEPs set the terms of the services he requires to receive a

4

FAPE and have mandated the educational services that Cedarcrest has provided to NT for the past four school years.

17.     On June 12, 2025, the Maine Department of Education determined that RSU 67 bore the responsibility to provide payment to Cedarcrest beginning on the date NT was enrolled as a student at RSU 67, i.e., from February 2, 2023 forward. The Department determined that RSU 67 "cannot take the position that a FAPE remains available in the student's district of residence when there has been a medical determination that the student's ongoing medical needs require that they be away from that district of residence."

18.     RSU 67 did not appeal from or otherwise challenge the State's determination. Rather, RSU 67 began paying for NT's education at Cedarcrest in June 2025 and has continued to do so. RSU 67, however, has refused to pay for the educational services Cedarcrest provided for NT prior to the Department's June 2025 determination. The total amount of those unpaid educational services is $387,727.56.

## Count I – Quantum Meruit

19.     Cedarcrest repeats the allegations set forth in paragraphs 1 through 18.

20.     At all relevant times, RSU 67 has had a legal obligation to provide NT with a FAPE, consistent with his IEPs, and to fund all necessary services set forth in his IEPs.

21.    Cedarcrest rendered services to RSU 67 by providing NT with the educational services that RSU 67 was legally obligated to provide him.

22.    RSU 67 knew Cedarcrest was providing NT's educational services and both consented to and benefitted from the provision of those educational services. RSU 67 regularly participated in developing the IEPs that detailed the educational services NT would receive by participating in NT's IEP Team meetings.

23.    Cedarcrest reasonably expected to be paid for the services it provided to RSU 67 since RSU 67 was legally obligated to pay for NT's FAPE.

24.    Cedarcrest provided RSU 67 with $387,727.56 in services to NT for which it has not been paid.

25.    Therefore, Cedarcrest is entitled to recover damages from RSU 67, as well as pre-judgment and post-judgment interest and costs.

## Count II – Unjust Enrichment

26.    Cedarcrest repeats the allegations set forth in paragraphs 1 through 25.

27.    Cedarcrest conferred a benefit on RSU 67 when Cedarcrest provided NT with the educational services that RSU 67 was legally obligated to provide NT.

28.    Through, among other things, participation in NT's periodic IEP Team meetings, RSU 67 knew it was receiving the benefit of Cedarcrest's services and actively shaped the nature of those services.

29.    Retention of such a benefit, valued at $387,727.56, without payment would be unjust.

30.     Therefore, Cedarcrest is entitled to recover the value of the benefit conferred from RSU 67, as well as pre-judgment and post-judgment interest and costs.

WHEREFORE, Cedarcrest respectfully requests that this Honorable Court:

A.     Enter judgment for Cedarcrest against RSU 67 in amount to be determined at trial, including interest, costs, and attorneys' fees; and

B.     Grant Cedarcrest such other and further relief as justice requires.

## JURY TRIAL DEMAND

Cedarcrest demands a trial by jury on all legal claims
for which it has a jury trial right.

Respectfully submitted,

Dated:  April 30, 2026April 30, 2026               */s/ Richard L. O'Meara*

Richard O'Meara
*romeara@mpmlaw.com*

MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME 04104-5085
(207) 773-5651

John-Mark Turner
(*to seek admission pro hac vice*)
*jturner@sheehan.com*

SHEEHAN, PHINNEY, BASS & GREEN, P.A.
1000 Elm Street, 17th Floor
Manchester, NH 03101
(603) 627-8143

Counsel for Plaintiff Cedarcrest, Inc.

7